Argued and submitted December 6, 2007, remanded for reconsideration
May 28, 2008

Susan M. SHANK,
*Petitioner,*

*v.*

BOARD OF NURSING,
*Respondent.*

Oregon State Board of Nursing
0429; A132269

185 P3d 532

Thomas K. Doyle argued the cause for petitioner. With him on the briefs was Bennett, Hartman, Morris & Kaplan, LLP.

Denise Fjordbeck, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Sercombe, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

This case involves judicial review of an order of the Oregon State Board of Nursing that permanently revoked petitioner's nursing license. On review, petitioner argues that the board erred in several ways, including that it improperly limited petitioner's cross-examination of one of the board's witnesses based on its belief that petitioner was a member of "the public" for purposes of ORS 676.175(1). That statute prohibits regulatory boards from "disclos[ing] to the public any information obtained by the board as part of an investigation of a licensee or applicant * * *." ORS 676.175(1). We agree that the board erred as a result of its incorrect construction of ORS 676.175, and we therefore remand for reconsideration.

Petitioner worked at Providence Portland Medical Center as a registered nurse from 1985 until August 2003. In August 2003, petitioner was working a swing shift on the telemetry unit, where patients are transferred after surgery or intensive care. Toward the end of her shift, one of the patients under petitioner's care died. Following the patient's death, petitioner was suspended by Providence and then resigned from her position. The following March, the board proposed to permanently revoke petitioner's nursing license based on its investigation of the circumstances surrounding the patient's death. The notice of proposed revocation alleged five bases for revoking petitioner's license:

> "[1.]  On August 24, 2003 you were assigned to the care of [patient C.R.] on the evening shift. C.R. had been having tarry stools. You documented that she had diarrhea and was up to the bathroom approximately 20 times on your shift. You also documented that she was clammy all shift and became progressively weaker as well as pale. After performing an initial assessment at 4:16 PM you failed to adequately assess C.R. throughout your shift, including a failure to take vital signs until the very end of the shift, despite significant changes in her condition. This failure to adequately assess is a violation of ORS 678.111(1)(f) and OAR 851-045-0015(1)(b), (2)(b), and (4)(b).

"[2.]  When C.R. reported pain to you on the evening of August 24, 2003, you initially removed a dose of Morphine Sulfate from the Pyxis machine for C.R.'s complaints of pain but did not administer the medication because the family told you that C.R. was not to have narcotics. You did not verify this with the physician, but gave Tylenol instead. C.R.'s pain was reported as 8 out of 10 on the pain scale. This failure to properly assist in the management of C.R.'s pain is a violation of ORS 678.111(1)(f), and OAR 851-045-0015(2)(b), (4)(b).

"[3.]  Despite C.R.'s deteriorating condition throughout the shift, you failed to notify the charge nurse or contact the physician. This failure to appropriately communicate information regarding C.R.'s condition to other members of the health care team is a violation of ORS 678.111(1)(f), and OAR 851-045-0015(1)(b), (3)(h), (4)(b).

"[4.]  You administered Xanax, an anti-anxiety agent, twice during the shift and documented that C.R. was afraid to go to sleep, yet you failed to identify this as a significant concern and to take further action to assess her or to notify the charge nurse or physician. You also ignored C.R.'s request for Oxygen when she was anxious. This failure to properly identify the significance of C.R.'s concern and to take appropriate action is a violation of ORS 678.111(1)(f), and OAR 851-045-0015(1)(b), (2)(b), (3)(h), (4)(b).

"[5.]  After checking C.R.'s blood pressure at 11:00 P.M. and finding it to be 80/? you told C.R.'s husband that you believed that C.R. did not look good and was going to die. It is inappropriate to provide this information to the husband of a patient and is a violation of ORS 678.111(1)(f), and OAR 851-045-0015(4)(b)."

In response to the notice of proposed revocation, petitioner requested a hearing on the allegations. Her counsel then issued a subpoena *duces tecum* to the board's investigator, Hudson, requesting that Hudson bring to the hearing her entire file and any other documents pertaining to the charges or investigation. The board, in turn, moved to quash the subpoena, arguing, in part, (1) that its own procedural rules limited discovery to "a list of witnesses to be called by the parties in their case in chief and the documents that the parties intend to introduce as exhibits at the contested case

hearing during the presentation of their case in chief," OAR 851-001-0005(5),[1] and (2) that state law governing confidentiality of board investigations prohibited petitioner from obtaining any of the requested information. As to the latter contention, the board relied on ORS 676.175(1) (2003),[2] which provided:

> "A health professional regulatory board shall keep confidential and not disclose to the public any information obtained by the board as part of an investigation of a licensee or applicant, including complaints concerning licensee or applicant conduct and information permitting the identification of complainants, licensees or applicants. However, the board may disclose information obtained in the course of an investigation of a licensee or applicant to the extent necessary to conduct a full and proper investigation."

According to the board's argument, petitioner is a member of "the public" for purposes of ORS 676.175, and the board therefore was not authorized to disclose to petitioner any of the information that it obtained as a result of the investigation of her conduct.

The motion to quash was submitted to an administrative law judge (ALJ) from the Office of Administrative Hearings. The ALJ ruled in favor of petitioner, concluding (1) that the Attorney General's model rules of procedure—and not OAR 851-001-0005(5)—governed discovery and (2) that the text and context of ORS 676.175 did not support the board's construction of that statute. Pursuant to OAR 137-003-0640(1)(a),[3] the board reviewed and reversed the ALJ's ruling. The board, in its role as a reviewing agency,

---

[1] Citations to administrative rules are to the version applied by the board in this case.

[2] Unless otherwise noted, all citations to statutes in ORS chapter 676 are to the 2003 version of those statutes, which were in effect at the time of the relevant proceedings. Many of the statutes have since been amended.

[3] OAR 137-003-0640(1)(a) provides:

"Before issuance of a proposed order or before issuance of a final order if the administrative law judge has authority to issue a final order, the agency or a party may seek immediate review by the agency of the administrative law judge's decision on any of the following:

"(a) A ruling on a motion to quash a subpoena under OAR 137-003-0585[.]"

concluded that petitioner "should have raised the underlying discovery issue in time to avoid further delay of the hearing"; that petitioner "failed to follow the correct procedure to obtain discovery"; that OAR 851-001-0005(5) did, in fact, limit discovery to a list of witnesses and documents that the parties intend to introduce as exhibits; that ORS 676.175 prohibited further discovery; and that the documents sought by petitioner were protected by the attorney-client privilege. Accordingly, the board issued an interim order granting the motion to quash.

The parties then proceeded to a contested case hearing before the ALJ. In its case-in-chief, the board, in its enforcement role, presented testimony from West, the nurse manager of petitioner's unit at Providence; Gloier, the clinical resource coordinator at the hospital; Garolis, a clinical nurse specialist at Providence who examined the circumstances surrounding the patient's death; the patient's daughter, who was in the room with the patient for much of the day before her death; and Hudson, the board's investigator. Petitioner offered her own testimony and the testimony of Kinniburgh, petitioner's charge nurse[4] for part of the day that the patient died.

The evidence offered by the parties presented two very different versions of petitioner's performance of her nursing duties. The board offered hospital records, including chart notes, that suggested that petitioner had not carefully monitored the patient's vital signs or contacted a physician or other nurses concerning the patient's deteriorating condition. The board's witnesses similarly testified, based primarily on second-hand reports (including an interview that West conducted with petitioner in the aftermath of the patient's death), that petitioner did not communicate any of her concerns about the patient with the patient's physician; that, despite the fact that the patient was rating her pain at 8 out of 10, petitioner attempted to manage the pain with Tylenol; and that petitioner left the patient alone in the room after she

---

[4] According to the testimony, a "charge nurse" provides "support to the nurses, they make sure that patient flow works, but they don't do evaluations and they do not discipline." That is, they have supervisory duties regarding operations but not personnel.

was unable to get a diastolic reading for the patient's blood pressure.

On the other hand, petitioner and Kinniburgh testified that the documents and second-hand reports did not tell the whole story—that she and petitioner carefully monitored patient's condition and her reports of pain but simply neglected to document their efforts in the patient's chart. Kinniburgh further testified that she had contacted a doctor on duty about the patient's condition and that the doctor had checked on the patient. Kinniburgh, who still worked at Providence, took responsibility for the lack of documentation and testified that petitioner had been unfairly singled out by the hospital.

The question of whether petitioner had adequately communicated the patient's deteriorating condition to other doctors and nurses was one of the key issues in the case. With respect to that issue, the board's counsel asked Hudson:

> "Based on the acceptable standards of practice for nursing in Oregon, did [petitioner] appropriately communicate [the patient's] condition to either [the patient's] doctor or attending physician, the charge nurse at the time, or what might have been other members of the health care team on August 24th, 2003?"

Hudson answered, "No, she did not." She then explained, "Well, for one thing there is nothing that she has documented in this record that would indicate that she did so. And, in nursing there is most definitely an axiom, but if it's not documented it's not done." Later, in that same explanation, she testified, "[T]here is nothing in here [the documents] that would indicate, and there is no one that I—that I have spoke—or no one that has indicated that that—that any real communication occurred about this situation."

Petitioner's counsel, on cross-examination, then inquired regarding whom Hudson had spoken with as part of the investigation, including whether she "spoke with anyone that's indicated that they spoke with [petitioner] about the status of this patient?" The board's counsel objected, arguing that the line of questioning "goes beyond what the Board is relying upon in this hearing." Counsel and the ALJ then engaged in the following colloquy:

"[PETITIONER'S COUNSEL]: And I think we're entitled to find out if she spoke with anyone else and on what she's basing her opinions. And she's actually already provided extensive opinion as to whether this nurse has violated these rules. And all we have to rely upon is her good faith affirmation that, in fact, she didn't rely upon other information that she had before you, but that the Board is unwilling to disclose in this matter. She had access to other information relating to this case, she's formed an opinion based upon information that's before her. We have a right to find out if there's other information beyond what's been produced in this record.

"[ALJ]: I have to take that under advisement, so I'm not going to require her to answer the question at this time.

"[BOARD'S COUNSEL]: Okay.

· "[ALJ]: Do I have a copy of the [interim board order on discovery]? Well, I'll—by tomorrow morning I'll look at it.

"[PETITIONER'S COUNSEL]: The Board order only speaks to discovery relating to documentation. I don't think there's any interpretation that the Board has ever proposed in the past that limits our ability to find out if she spoke with additional individuals outside of those that have been named. And if that's the position of the Board now, I would like to get that on the record for purposes of appeal.

"* * * * *

"[PETITIONER'S COUNSEL]: And I'd like to—the question, if I frame the question appropriately, the question is I would like to know if she spoke with anyone other than the individuals for whom we've been provided—actually, has she spoken with anyone who has not testified in this matter to this point, relating to [petitioner]."

After reviewing the board's interim order granting the motion to quash, the ALJ sustained the board's objections to petitioner's questions concerning Hudson's investigation.

After the close of the record, the ALJ issued a proposed order that included detailed findings of fact, including express credibility determinations. The ALJ found that the board had provided "no first-hand testimony of what happened the night in issue. Only [petitioner] and RN Kinniburgh provided first-hand testimony." The ALJ further

found that "RN Kinniburgh's demeanor was direct, straight-forward, and very earnest[,]" and that she "admitted many facts contrary to her interest." The ALJ also found petitioner to be credible and noted that her demeanor "was also direct and straightforward, although her answers at time lacked some detail and plausibility." The ALJ noted some internal inconsistencies in petitioner's testimony but found that they "were more likely due to her nervousness because her demeanor was earnest and credible, she admitted facts contrary to her interest, the Board relied on parts of her testimony, and the Board had no direct evidence from another source to rebut her testimony."

The ALJ then made the following proposed findings and conclusions:

"1.   [Petitioner] failed to adequately assess the condition of Patient R, thereby violating ORS 678.111(1)(f) and OAR 851-045-0015(2)(b).

"2.   [Petitioner] failed to properly assist in the management of Patient R's pain, thereby violating ORS 678.111(1)(f) and OAR 851-045-0015(2)(b) and (4)(b).

"3.   [Petitioner] failed to appropriately communicate information regarding Patient R's condition to other members of the health care team, thereby violating ORS 678.111(1)(f) and OAR 851-045-0015(1)(b) and (3)(h).

"4.   [Petitioner] did not fail to properly identify the significance of Patient R's anxiety and to take appropriate action and did not violate ORS 678.111(1)(f) and OAR 851-045-0015(1)(b), (2)(b), (3)(h), and (4)(b).

"5.   [Petitioner] did not inappropriately provide information to Patient R's husband and did not violate ORS 678.111(1)(f) and OAR 851-045-0015(4)(b).

"6.   [Petitioner's] nursing certificate is suspended for two years."

In its final order, the board rejected the ALJ's credibility determinations and modified a number of the ALJ's proposed findings. The board then made additional findings and explained that it also was "reject[ing] the ALJ's proposed conclusions of law, which were based upon erroneous findings of fact * * *." The board then made 14 conclusions of

law,[5] the first 13 of which concluded that petitioner had violated ORS 678.111(1)(f) and OAR 851-045-0015.[6] The final conclusion was that petitioner's nursing license "should be revoked for having committed the foregoing conduct derogatory to the practice of nursing." Petitioner seeks review of that order.

On review, petitioner advances 10 assignments of error. The first concerns the board's interim ruling that quashed petitioner's subpoena *duces tecum* seeking documents from Hudson, the board's investigator.[7] Petitioner argues that the board erred in quashing the subpoena because "(1) discovery of investigative files concerning [petitioner] is relevant and not prohibited by any statute or rule; and (2) specifically, ORS 676.175 (2003) does not prevent a licensee charged with misconduct from reviewing investigative files concerning the licensee."

As noted above, 220 Or App at 232-33, the board granted the motion to quash on a number of grounds, including the potential delay of the hearing as a result of the subpoena *duces tecum*, that the subpoena *duces tecum* was the incorrect procedural vehicle to obtain discovery of documents, and that the documents sought by petitioner were protected by the attorney-client privilege. On review, petitioner does not challenge or even mention those alternative bases for quashing the subpoena. Thus, even assuming that petitioner's first assignment of error has merit, she has not

---

[5] The board concluded that the ALJ's proposed order, which identified only five issues, did not "adequately or specifically address each alleged violation by [petitioner]."

[6] ORS 678.111(1)(f) provides that a nursing license may be revoked or suspended or the licensee may be placed on probation for "[c]onduct derogatory to the standards of nursing." OAR 851-045-0015, in turn, provides examples of "conduct derogatory to the standards of nursing." In this case, the relevant provisions are OAR 851-045-0015(1)(b) ("Failing to take action to preserve or promote the client's safety based on nursing assessment and judgment."); OAR 851-045-0015(2)(b) ("Neglecting a client. The definition of neglect includes but is not limited to carelessly allowing a client to be in physical discomfort or be injured."); OAR 851-045-0015(3)(h) ("Failing to communicate information regarding the client's status to members of the health care team (physician, nurse practitioner, nursing supervisor, nurse co-worker) in an ongoing and timely manner."); and OAR 851-045-0015(4)(b) ("Failing to conform to the essential standards of acceptable and prevailing nursing practice. Actual injury need not be established.").

[7] The interim ruling was incorporated in and made part of the final order.

demonstrated that such an error would compel any different action by the board. *See* ORS 183.482 (providing that the court shall set aside the order, modify the order, or remand the case to the agency where the court finds that the agency "has erroneously interpreted a provision of law *and* that a correct interpretation compels a particular action * * *.") (Emphasis added.); *cf. Roop v. Parker Northwest Paving Co.*, 194 Or App 219, 236, 94 P3d 885 (2004), *rev den*, 338 Or 374 (2005) ("[W]here plaintiffs fail to challenge the alternative basis of the trial court's ruling, we must affirm it."). For that reason, we reject petitioner's first assignment of error.

We turn next to petitioner's seventh assignment of error, because our resolution of that assignment requires that the case be remanded to the board.[8] In her seventh assignment of error, petitioner argues that the board's order is defective because petitioner was denied the opportunity to cross-examine Hudson regarding the persons with whom she had spoken that resulted in her opinion that petitioner violated essential standards of nursing. For the reasons that follow, we agree with petitioner and conclude that the board added a gloss to ORS 676.175 that the legislature did not intend; consequently, the board, by virtue of its erroneous interpretation of the statute, was deprived of a complete evidentiary record on which to base its ruling. *See* ORS 183.482(8)(a)(B) (where an agency has erroneously interpreted a provision of law, court shall remand the case for further action under a correct interpretation of the law); *Manning v. LCDC*, 198 Or App 488, 494, 109 P3d 376 (2005) (remanding the case under ORS 183.482(8)(a) where the agency's approval of the county's decision was based on an incomplete record).

At the risk of being redundant, we summarize the state of the evidentiary record before the board and the issue it frames. One of the main points of disagreement between the parties was whether petitioner had communicated her

---

[8] Petitioner's other assignments of error address the board's findings and conclusions, as well as other evidentiary issues that may or may not arise on remand. Accordingly, we do not express any opinion as to the merits of petitioner's remaining assignments of error.

concerns about the patient to other nurses and doctors. Petitioner claimed that she did; the board's investigator opined that she did not. On cross-examination, petitioner questioned Hudson concerning the persons with whom she had spoken as part of her investigation of petitioner's alleged misconduct. The board objected to those questions—and the ALJ sustained the board's objection—on the ground that the details of Hudson's investigation were confidential.

On review, petitioner argues that the board denied her the opportunity to test the basis for Hudson's opinion—a matter of particular significance, in petitioner's view, because "[her] opinion forms the only basis for [the board's] conclusion [that petitioner] violated essential standards of nursing." (Emphasis by petitioner.) As petitioner explains the issue,

"Petitioner asked Investigator Hudson who she spoke with as part of her investigation. This question was in response to her testimony that: 'there is no one that—that I have spoke—or no one that has indicated that that—that any real communication occurred about this situation.' [The board] objected based upon confidentiality and it was sustained. In this case, a key question is whether [petitioner] or Ms. Kinniburgh spoke with any physicians on the night of the 24th of August. They say they did. [The board] says they did not."

The board, in response, contends that the ALJ correctly sustained the objection on the basis of the "public officer privilege" under OEC 509. That rule provides that "[a] public officer shall not be examined as to public records determined to be exempt from disclosure under ORS 192.501 to 192.505."[9] ORS 192.502(9), one of the statutes incorporated in OEC 509, provides that "[p]ublic records or information the disclosure of which is prohibited or restricted or otherwise made confidential or privileged under Oregon law" shall not be disclosed. And, according to the board, the investigative records on which petitioner sought to cross-examine

---

[9] Although the Oregon Evidence Code generally does not apply to contested cases, ORS 183.450(1) provides that "[a]gencies and hearing officers shall give effect to the rules of privilege recognized by law."

Hudson were, in turn, confidential under ORS 676.175(1), which provides:

> "A health professional regulatory board shall keep confidential and not disclose to the public any information obtained by the board as part of an investigation of a licensee or applicant, including complaints concerning licensee or applicant conduct and information permitting the identification of complainants, licensees or applicants. However, the board may disclose information obtained in the course of an investigation of a licensee or applicant to the extent necessary to conduct a full and proper investigation."

The premise for the board's position is that, for purposes of ORS 676.175(1), petitioner—a nurse facing revocation of her license in a contested case proceeding—is a member of "the public" to whom the board is prohibited from providing information obtained as part of its investigation. Thus, the question before us is one of legislative intent, and we apply the methodology described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993), by first examining the text and context of the statute in order to discern that intent. As part of the context, we consider other subsections of the statute, *id.*, as well as prior versions of the statute, *State v. Webb*, 324 Or 380, 390, 927 P2d 79 (1996) ("Prior enacted legislative changes are part of a statute's context.").

ORS 676.175(1) was enacted in 1997 as part of a comprehensive bill to address the practices of health professional regulatory boards and peer review bodies. Or Laws 1997, ch 791. Section 2 of that law, which was codified at ORS 676.175, provided:

> "(1) A health professional regulatory board *shall keep confidential and not disclose to the public any information obtained by the board as part of an investigation of a licensee or applicant, including complaints concerning licensee or applicant conduct and information permitting the identification of complainants, licensees or applicants.*
>
> "(2) Notwithstanding subsection (1) of this section, if a health professional regulatory board determines by a majority vote of the board that no notice of intent to impose

a disciplinary sanction shall be issued, the board shall disclose information obtained as part of an investigation of an applicant or licensee if the person requesting the information demonstrates by clear and convincing evidence that the public interest in disclosure outweighs other interests in nondisclosure, including but not limited to the public interest in nondisclosure.

"(3) A health professional regulatory board shall disclose a notice of intent to impose a disciplinary sanction against a licensee or applicant that has been issued by a majority vote of the board, a final order that results from the board's notice of intent to impose a disciplinary sanction, a consent order or stipulated agreement that involves licensee or applicant conduct, and information to further an investigation into board conduct under ORS 192.685.

"(4) If a notice of intent to impose a disciplinary sanction has been issued by a majority vote of a health professional regulatory board, a final order that results from the board's notice of intent to impose a disciplinary sanction or a consent order or stipulated agreement that involves licensee or applicant conduct shall summarize the factual basis for the board's disposition of the matter.

"(5) A health professional regulatory board record or order, or any part thereof, obtained as part of or resulting from an investigation, contested case proceeding, consent order or stipulated agreement, is not admissible as evidence and may not preclude an issue or claim in any civil proceeding except in a proceeding between the board and the licensee or applicant as otherwise allowed by law."

Or Laws 1997, ch 791, § 2 (emphasis added).[10]

The statute did not specifically define what it is to "keep confidential" or "not disclose to the public." Accordingly, we give those terms their ordinary meanings. *PGE*, 317 Or at 611. The term "confidential" means "communicated, conveyed, acted on, or practiced in confidence : known

---

[10] ORS 676.175 was amended again in 1999, but none of those amendments addressed the statutory language at issue in this case. Or Laws 1999, ch 751, § 3. Accordingly, we focus on the statutory context that existed at the time that the relevant language was enacted. *See Strunk v. PERB*, 338 Or 145, 189, 108 P3d 1058 (2005) (where statute is subsequently amended, "[i]t is presumed that such changes in meaning do not go further than is expressly declared or necessarily implied") (internal quotation marks omitted).

only to a limited few : not *publicly* disseminated." *Webster's Third New Int'l Dictionary* 476 (unabridged ed 2002) (emphasis added). The term "publicly," in turn, is defined, as "**1** : in public : in a manner observable by or a place accessible to the public * * * **2** : by the public : by the people generally * * *." *Id*. at 1836. Thus, the phrase "keep confidential" means that any information that is obtained by the board as part of an investigation will be communicated only to a limited few and will not be disseminated to the people generally.

The term "disclose" means "**a** : to expose to view * * * **b** : to make known : open up to general knowledge * * *; *esp* : to reveal in words something that is secret or not generally known * * *." *Id*. at 645. The relevant dictionary definition of the term "public," when used as a noun, is "the people as a whole : POPULACE, MASSES * * *." *Id*. at 1836 (uppercase in original). Thus, the term "not disclose to the public" would appear to mean that the board shall not reveal the information to the masses.

Both phrases, "keep confidential" and "not disclose to the public," suggest that the information that is subject to the statute can be properly communicated to a limited class of persons who are involved in the proceeding but not to the public as a whole. Moreover, when the phrases are considered in the context of the entire statute, it appears that the words "the public" *do not* include a licensee or applicant who has received a notice of intent to impose a disciplinary sanction. First, subsection (1) of the statute refers separately to "applicants," "licensees," "complainants," and "the public." The fact that the statute employs separate terms to describe various groups of persons—without any indication that "the public" is intended to encompass the other separately identified individuals (applicants, licensees, and complainants)— suggests that those separately identified groups are distinct from "the public" for purposes of the statute. *See, e.g., Atkinson v. Board of Parole*, 341 Or 382, 388, 143 P3d 538 (2006) ("As this court has explained previously, when the legislature uses different terms within the same statute, normally it intends those terms to have different meanings."); *cf. State v. Gatt*, 210 Or App 117, 121-22, 149 P3d 1220 (2006) (use of both the terms "victim" and "witness" "suggests that

the legislature intended the terms 'victim' and 'witness' to refer to two different persons"); *Young v. State of Oregon*, 177 Or App 295, 301, 33 P3d 995 (2001) (separate use of terms "employee" in ORS 238.005(5) and "public official" in ORS 244.020(15) "suggest that the legislature regards state or public 'officers,' including elected officers, as being distinct from state employees").

Second, in light of the fact that the statute contemplates the imposition of sanctions against an applicant or licensee, including the revocation of a professional license, it is counterintuitive to believe that the legislature would have intended to include "licensees" and "applicants" within the meaning of the term "the public." Additionally, the text of the statute does not expressly impose any restrictions or limitations on cross-examination of the board's investigator during a contested case proceeding. Yet, the board's interpretation would require us to add that limitation, contrary to ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted * * *."). Where the language of the statute clearly contemplates disciplinary sanctions as the result of a contested case proceeding but does not express any legislative intent to limit an applicant or licensee's ability to defend against charges of misconduct in the manner suggested by the board, we will not write that limitation into the statute.[11]

The broader context of ORS 676.175(1) also suggests that "the public" does not include an applicant or licensee in a contested case proceeding. The statutory scheme as a whole evidences the legislature's intent to balance the interests of "the public" against the privacy interests of "complainants, licensees, [and] applicants" concerning the investigation and discipline of licensees or applicants. *See* ORS 676.175(1), (2); *see also* ORS 676.180 (requiring notice to the applicant or

---

[11] The importance of the requirement that courts not insert what has been omitted is particularly apparent where the proposed addition of language would raise due process concerns. Under the board's construction of the statute, its investigator could testify (as she did in this case) that the licensee violated established standards of professional conduct and, at the same time, refuse to disclose the basis for that opinion on the ground that it is not subject to disclosure under ORS 676.175.

licensee in the event that the board proposes to disclose records pursuant to ORS 676.175(2)). As part of the balancing of interests, the statutory scheme permits the board to disclose to the public certain information in the event that the "board votes *not to issue a notice of intent to impose a disciplinary sanction*." ORS 676.175(2). In that instance,

> "the board shall disclose information obtained as part of an investigation of an applicant or licensee if the person requesting the information demonstrates by clear and convincing evidence that the public interest in disclosure outweighs other interests in nondisclosure, including but not limited to the public interest in nondisclosure."

*Id.* If, as the board suggests, the legislature intended to limit disclosure of information to an applicant or licensee in a contested case proceeding, the statute would produce a bizarre result: A licensee or applicant potentially could obtain information concerning the board's investigation in the event that the board voted *not to issue a notice of intent to impose a disciplinary sanction*, ORS 676.175(2), but would not be entitled to obtain that same information in order to defend against allegations made in a contested case proceeding under the board's interpretation of ORS 676.175(1).[12]

Given the text, context, and manifest purpose of the statutory scheme as a whole, we conclude that the legislature

---

[12] We note that, in 2005, the legislature specifically addressed the disclosures that a health professional regulatory board must make to a licensee or applicant after issuing a notice of intent to impose a disciplinary sanction. Or Laws 2005, ch 801, § 1. That new subsection of ORS 676.175 now provides:

"(3) If a health professional regulatory board votes to issue a notice of intent to impose a disciplinary sanction, upon written request by the licensee or applicant, the board shall disclose to the licensee or applicant all information obtained by the board in the investigation of the allegations in the notice except:

"(a) Information that is privileged or confidential under a law other than this section.

"(b) Information that would permit the identification of any person who provided information that led to the filing of the notice and who will not provide testimony at a hearing arising out of the investigation.

"(c) Information that would permit the identification of any person as a person who made a complaint to the board about a licensee or applicant.

"(d) Reports of expert witnesses."

*did not* intend the requirements that the board "keep confidential" and "not disclose to the public" any information obtained in the course of its investigation of an applicant or licensee to limit the board's disclosure of that information to the applicant or licensee in the course of a contested case hearing. Rather, in light of its apparent objective, an applicant or licensee who is facing a disciplinary sanction in a contested case proceeding is not, for the purposes of that statute, a member of "the public."[13]

Because the meaning of the statute is apparent from its text and context, it is not necessary that we resort to legislative history in this case. In any event, the extensive legislative history of Senate Bill (SB) 235 (1997), of which ORS 676.175 was a part, does not reveal any intent to prohibit disclosure of information to applicants and licensees who are facing disciplinary sanctions in contested case proceedings. Rather, the discussions concerning the bill repeatedly referred to licensees and "the public" as separate groups with separate concerns regarding disclosure. *See, e.g.*, Tape Recording, Senate Business, Law and Government Committee, SB 235, Apr 8, 1997, Tape 144, Side B; Tape Recording, Senate Business, Law and Government Committee, SB 235, May 21, 1997, Tape 238, Side A.

Nonetheless, the board relies on legislative history that indicates that the purpose of SB 235 was, in part, to "protect the identity of complainants and witnesses from the licensee, not simply to protect the licensees themselves." The board is correct that SB 235 addressed the subject of the confidentiality of complaints. As explained above, SB 235 balanced a number of concerns, including the interests of complainants, licensees and applicants, and the "public," and it addressed not only health professional regulatory boards but also amended statutes pertaining to "peer review bodies," such as the governing bodies within hospitals. As ultimately enacted into law, the bill provided for the absolute confidentiality of complainants in the context of "peer review bodies,"

---

[13] As part of the statutory context, we have also considered ORS 676.165, which concerns investigation of complaints. Subsection (5) of that statute provides that "[i]nvestigatory information obtained by an investigator and the report issued by the investigator shall be exempt from public disclosure." Nothing in that statute meaningfully adds to or detracts from our analysis of the language in ORS 676.175.

*see* Or Laws 1997, ch 791, § 6(4) (providing that persons supplying information to a peer review body and persons conducting an investigation "shall not be examined as to any communication to or from, or the findings of, that peer review body or person"). But, as our statutory analysis above illustrates, the bill did not afford the same degree of confidentiality to complainants in the context of complaints made to health professional regulatory boards. Thus, the legislative history of SB 235 cited by the board does not undermine the meaning of ORS 676.175(1) that we have discerned from its text and context.

In sum, we conclude that petitioner was erroneously denied an opportunity to cross-examine Hudson regarding the bases for her opinion that petitioner violated the essential standards of nursing. Accordingly, the board's order finding that petitioner violated those standards was based on an incomplete record, and we remand so that petitioner can be provided an adequate opportunity to cross-examine the board's investigator, thereby allowing the board to reconsider its order in this case based on a complete record.[14]

Remanded for reconsideration.

---

[14] Again, in light of the fact that our remand contemplates the reopening of the evidentiary record, we decline to address any of petitioner's other assignments of error because we are unable to predict whether they will arise again.