No. 460 May 28, 2026 71

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROBERT JAY JAMES, JR.,
aka Robert James, Jr.,
*Defendant-Appellant.*

Multnomah County Circuit Court
18CR66906; A179479

Kathleen M. Dailey, Judge.

Argued and submitted October 23, 2024.

Kali Montague, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Colm Moore, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

PAGÁN, J.

Reversed and remanded.

**PAGÁN, J.**

In this criminal case, defendant appeals from a judgment for second-degree murder and related convictions stemming from a shooting after a show at the Moda Center. Defendant raises five assignments of error. The crux of this appeal is defendant's second assignment of error, in which he asserts that the trial court erred when it failed to give a jury instruction stating there was no duty to retreat before using self-defense. We agree and accordingly reverse and remand.

With regard to defendant's remaining assignments of error, we conclude that there was no error or, alternatively, decline to reach them. In his first assignment of error, defendant asserts that the trial court erred when it denied a motion for judgment of acquittal (MJOA) on grounds of transferred intent. We conclude that the trial court did not err but clarify that transferred intent is a legal fiction that we do not follow absent legislative intent. We do not reach defendant's third assignment of error, regarding racialized questions in the cross examination, because the issue is unlikely to arise on remand. The same is true for defendant's fourth assignment of error, asserting that the prosecutors' closing argument denied him a fair trial, and for his fifth assignment of error, which concerns sentencing.

## I. BACKGROUND

On the night of October 5, 2018, a comedy show had recently ended at the Moda Center in Portland. A rented white Durango with darkly tinted windows pulled up alongside the Moda Center. It stopped to pick up a passenger, who opened a door and sat in the back seat. At least three people were in the vehicle at that point: the driver, C; the passenger in the front seat, MJ; and at least one unknown passenger in the backseat. The Durango then drove forward to a traffic light but paused and remained stopped even though the light was green and the crosswalks were empty. Defendant was walking on the sidewalk on the same side of the street as the Durango, in the same direction of the Durango. As defendant reached a point perpendicular to the front passenger window, defendant pulled a gun and began shooting

at the vehicle. The Durango accelerated and defendant kept firing towards the vehicle as he was walking into the street behind the Durango, such that he eventually shot through the Durango's back window. The vehicle sped from the scene and drove to a nearby hospital, where MJ was pronounced dead. Multiple videos captured various portions of the event, including the shooting itself and the Durango speeding away.

An officer, who was on foot, was near the intersection at the time of the shooting and immediately chased after defendant and apprehended him. An Uber driver who was in the lane next to the Durango testified that police captured the right suspect, as he witnessed both the shooting and the capture. While being booked in jail, defendant stated "how much time do you think I'm going to get?"

A bystander at a nearby TriMet station, MN, was injured by a piece of shrapnel. The driver of the Durango was shot twice but lived. A nearby car, which was occupied, was shot once. Video showed that when the shooting began, the people at the intersection scattered quickly. There was also a crowd of people at a nearby TriMet station who could be seen fleeing the gunfire. Police searched the area for shell casings and bullets and searched the Durango for other evidence. Police recovered 13 shell casings and identified 15 shots fired. The police obtained video footage from multiple local security cameras.

In the leadup to trial, in November 2019, defendant filed a notice that he intended to pursue self-defense. In June 2020, the defense received access to the Durango to swab the vehicle to test for gunshot residue, with a detective present to chaperone counsel and their forensic technicians. During the process, and for apparently the first time in the nearly two years since the shooting, the detective opened the center console of the Durango. To the detective's "shock and horror," therein was a revolver, which had been missed in the initial search of the Durango. At trial, MN testified that there had been shots fired from inside the Durango, although none of the recovered bullets could be clearly identified as coming from inside the Durango, and MN had been intoxicated at the time. The gunshot residue tests of the inside of the Durango

were inconclusive.[1] The prosecutor argued that MN was mistaken and that the still-fully loaded revolver and testimony of other witnesses was proof that it had not been fired.[2]

The state's theory at trial was that defendant had intentionally murdered the victim and that the shooting was not self-defense. Defendant's defense at trial was that one of the occupants of the Durango had pointed a gun at him, and he acted in self-defense. Defendant relied on the revolver, MN's testimony, and the autopsy to argue that another occupant of the car had been armed and that that person fired their weapon.

A medical examiner testified as to the results of the autopsy. MJ was shot three times: in the wrist, the face, and the brainstem—which the examiner opined was the fatal shot. Additional wounds to the chest could have been gunshot grazes, or potentially a result of efforts to save his life. According to the examiner, the wrist and face shots entered through the right side of the body, but the brainstem shot entered through the left side. The entry point and path of the bullets indicated one of two possibilities. First, it was possible that MJ had been shot once, then rapidly turned his head 180 degrees, such that he could be shot at a different angle. Second, it was possible that MJ had been shot from within the vehicle and that another shooter caused the injury.

Defendant used the second possibility to argue that a backseat passenger had been armed and potentially fired the fatal bullet. Defendant argued that theory was supported by inconclusive ballistics evidence[3] and by

---

[1] The testing was done on the initiative of the defense, and a gunshot residue expert testified for the defense. Defendant argued that the inconclusive result was due to the significant time that elapsed between the shooting and the sampling, and the poor storage conditions of the vehicle, as the windows had been loosely covered with plastic trash bags and the vehicle was left in a covered but not enclosed environment.

[2] The Uber driver, who happened to be a Marine veteran with firearms experience, testified that he thought there was only one shooter. Another Marine veteran, with combat experience, who had been on foot with his family, also testified that he thought there was one shooter. The Marine veteran on foot testified that he ran alongside one of the capturing police officers and also saw both the shooting and the capture.

[3] Some of the bullets were identified as having come from defendant's gun (a 9-mm Ruger pistol), but not all were. The bullet in MJ's brainstem had broken into many pieces when it hit a bone and could not be conclusively identified.

the inability to question the surviving Durango occupants. The driver of the Durango, C, was known but uncooperative during the investigation and could not be produced at trial. Police were unable to identify the third occupant of the Durango, who had been a passenger in the backseat, and who had left the Durango at some point before it reached the hospital. Defendant argued that the third passenger had left the Durango, with their gun, enroute to the hospital.

Defendant testified that he was downtown because he had hoped to find a date among the people who were leaving the Moda Center. He testified that, as he walked by the Moda Center, he saw the Durango suspiciously stopped at a green light and walked closer to investigate. As he did so, he saw one of the occupants was pointing a gun at him. He then pulled his own firearm and opened fire in self-defense. He testified that he ran from the scene and that he asked how much time he would get because he knew he was committing the offense of felon in possession (FIP) by possessing a gun. In closing argument, defendant conceded that he had committed FIP and asked the jury to convict him on that charge.

Defendant knew both C and MJ, but he asserted that he had no issues with them and did not see that they were the occupants before he started shooting. No motive evidence was elicited, either for why defendant would attack the occupants or why the occupants might have tried to attack defendant.

The cross-examination of defendant included an exchange in which the prosecutor inquired—in an apparent non-sequitur—whether defendant could read and write or had played sports in high school. Defendant is an adult Black man. The prosecutor's cross-examination began with:

"Q:   This jury doesn't know you.

"A:   No, sir.

"Q:   So I don't mean any offense by some of the questions I'm going to ask you. You can read and write?

"A:   Yeah.

"Q:   In fact, you've written a long letter to our office. Do you remember writing this letter to our office?

"A:   Yes.

"Q:   You did legal research in this letter; is that right?

"A:   Yes.

"[courtroom logistics omitted]

"Q:   All right. So I just want to make sure on how you present, you're educated. You can read and write.

"A:   I can read and write. I graduated from high school. I don't got, like, no master's degree or nothing from college or nothing."

The prosecutor then asked some questions regarding the FIP charge. Then, this exchange occurred:

"Q:   Did you play sports when you were at Jefferson [High School]?

"A:   No.

"Q:   No football?

"A:   No.

"Q:   Are you good at sports?

"A:   I could play a little."

There were no other questions about defendant's education or athleticism. The prosecutor then went directly into asking defendant whether he had seen the show at the Moda Center that night. The letter was not offered into evidence nor otherwise provided in the record.

The prosecutor explained in his closing argument how he and his team were blindsided by defendant's self-defense claim:

"Those are all the pieces of the puzzle that they're trying to sell you into a theory. And being experienced prosecutors, and experienced with a team of experienced detectives, and a lot of spit balling as my co-counsel has called it, kind of took all those pieces and tried to figure out what's that Defense theory going to be and to be prepared for it. Just like Detective Cui said, no inkling of self-defense from the investigation until the discovery of that gun in the console 20 months later."

The prosecutor also explained his reaction to hearing defendant's reason for approaching the Durango: "I almost fell out of my seat."

The prosecution's characterization of the self-defense theory extended to its theme. One prosecutor characterized defendant's self-defense theory as "snake oil" and used the phrase "snake oil" a total of ten times. Another prosecutor, in the rebuttal closing, used "snake oil" one more time. The prosecutor first brought up the idea by stating, "I'm going to compare the State theory of this case to the snake oil defense theory, right, that they're trying to sell you." He then stated, "[e]ven though there's no evidence that really supports their theory, no facts that support that snake oil." The prosecutor stated that defendant "had three-and-half years to think about this snake oil he [wants] to sell you." Then the prosecutor said "[y]ou can use that to weigh the likelihood that what the snake oil that he wants to sell you, whose version is right. The State's version or the snake oil version?" The prosecutor also referred to it as "their snake oil version," "his snake oil version," and "the snake oil he's trying to sell you." The prosecutor also stated:

> "Now, is it reasonable to keep firing? You can and should use that hinder [sic] by him, that whole time to determine is he acting reasonably or not. You can use that to weigh the likelihood that what the snake oil that he wants to sell you, whose version is right. The State's version or the snake oil version? Right. The fact that how he keeps after trying to hit those people.

> "If a threat of a mystery gun was pointed at you from that area and you shot at the mystery gun threat. Once the threat is over and the car is leaving, there is absolutely no way you could have seen that mystery gun still posing a threat. I mean, at what point does that threat go away, the mystery threat?"

In the rebuttal closing, the prosecutor said, in regard to the video of defendant walking to the Durango: "No, that's not self-defense, you don't walk towards a driver like that. Where I was just saying, you don't run towards a—your initial reaction on seeing something like that's going to be to pull backwards, protect yourself."

The jury found defendant guilty of eight counts: Count 1, second-degree murder, ORS 163.115; Count 2, attempted first-degree murder, ORS 163.095; Counts 3 and 4, second-degree assault with a firearm; Counts 5, 6, and 7, unlawful use of a weapon, ORS 166.220; and Count 8, felon in possession of a firearm, ORS 166.270. The court sentenced defendant to life in prison with the possibility of parole after 25 years, along with a 48-month consecutive sentence on Count 2, and a 12-month consecutive sentence on Count 4. The remaining sentences ran concurrently. Defendant timely appealed.

## II.   ANALYSIS

### A.   *Jury Instructions*

In his second assignment of error, defendant asserts that the trial court erred by failing to give his pre-ferred jury instruction on self-defense. Defendant proposed the following instruction, based on Uniform Criminal Jury Instruction (UCrJI) 1107 (defendant's proposed addition is italicized):

> "The defense of self-defense has been raised on Counts 1-7.

> "A person is justified in using physical force on another person to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force. In defending, a person may only use that degree of force which he reasonably believes to be necessary. *A person is not required to retreat before using deadly force to defend against the imminent use of deadly physical force by another.*

> "The burden of proof is on the state to prove beyond a reasonable doubt that the defense does not apply."

The state objected to defendant's addition. The trial court declined to give defendant's version and instead gave the standard UCrJI 1107. Both the state and defendant argue that their version was legally correct. We agree that both versions were correct statements of the law but conclude that the trial court erred in failing to give defendant's version.

We review a trial court's failure to give a requested jury instruction for errors of law. *State v. Reyes-Camarena*,

330 Or 431, 441, 7 P3d 522 (2000). "[A]n instruction is appropriate if it correctly states the law and is supported by evidence in the record, when the evidence is viewed in the light most favorable to the party requesting the instruction." *State v. Ashkins*, 357 Or 642, 648, 357 P3d 490 (2015). However, not all accurate statements of the law are required to be included in jury instructions: a trial court does not err in refusing to give a proposed instruction—even if legally correct—if the substance of the requested instruction is "'covered fully by other jury instructions given by the trial court' or if the requested instruction is 'not necessary * * * to explain the particular issue or point of law to the jury.'" *State v. Harryman*, 277 Or App 346, 356, 371 P3d 1213, *rev den* 360 Or 401 (2016) (quoting *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106, 957 P2d 147 (1998)). "A party is generally entitled to have a supplemental instruction given when the existing instructions, read as a whole, do not fully cover a necessary legal point, but is not entitled, in every case, to a special instruction that is tailored to the particular facts at issue." *State v. Cranston*, 344 Or App 535, 537, 581 P3d 152 (2025) (internal quotations and citations omitted)

In Oregon, there is no duty to retreat before using self-defense. *Compare State v. Sandoval*, 342 Or 506, 512, 156 P3d 60 (2007); *with State v. Blevins*, 10 NW3d 29, 36 (Minn 2024) (explaining that Minnesota is not a stand-your-ground state and judicially imposes a duty to retreat except in the home). In *Sandoval*, the trial court gave an instruction that there was such a duty to retreat. *Sandoval*, 342 Or at 509. The Supreme Court concluded that the instruction was erroneous because the legislature did not impose such a duty in the applicable statute. *Id*. Subsequently, and more recently, in *Cranston*, where the victim was allegedly the first aggressor and the state's argument focused on whether the defendant could have left the situation, we concluded that a court erred by failing to give a "no duty to retreat" instruction. 344 Or App at 545.

We first analyze whether defendant's suggested instruction was correct. *Id.* at 539. We conclude, based on the reasoning in *Cranston*, that defendant's proposed instruction was a correct statement of the law. *See id.* at 541-542 (so

analyzing). We then turn to whether the proposed instruction was necessary as a matter of law. *Id.* at 542.

Defendant argues that the prosecutor emphasized that defendant had acted unreasonably by not just walking away when he allegedly saw one of the Durango passengers point a gun at him, and by then continuing to fire, and that the jury was not appropriately instructed on that point, just as in *Cranston*. The state argues that defendant's theory was that, even if there was a gun in the Durango, defendant shot immediately; meanwhile, that the state's argument was that there was no gun, so the issue was not a live controversy. The state further contends that its argument about defendant's continued gunfire as the car sped away was about the reasonableness of the use of force, not about whether defendant should have retreated.

Based on 1) the portion of the state's closing argument in which the prosecutor argued that defendant's reaction upon seeing a gun inside the Durango should have been to retreat, not pull a gun, and 2) the video of the shooting, which appeared to show defendant walking towards the Durango, we agree that the duty to retreat was an issue that was being presented to the jury. While we understand that the state was also trying to argue that defendant was lying (as evinced by its tying of defendant's actions to its questionable snake oil theme), it directly implied that defendant should have retreated—which he was not required to do. As in *Cranston*, the jury should have received a correct statement of the law regarding the absence of a duty to retreat in order to correct any misapprehension because the nature of the argument and questioning made it necessary. Additionally, no other instruction appropriately addressed the issue. We conclude that the trial court erred by giving the standard instruction and declining to give defendant's requested instruction.

Lastly, the error was not harmless. In assessing harmlessness, we look to whether "there is 'little likelihood that the error affected the verdict.'" *Ashkins*, 357 Or at 660 (quoting *State v. Hansen*, 304 Or 169, 180-81, 743 P2d 157 (1987)). In doing so, we consider "the context of the evidence and record at trial, including the parties' theories of the

case." *Id*. Here, the duty to retreat was made an important issue not only by the prosecutor's arguments, but also by the video of the shooting. As in *Cranston*, "[w]ithout defendant's requested instruction, the jury may have—incorrectly—assumed that defendant had some duty to retreat when rejecting defendant's assertion of self-defense." *Cranston*, 344 Or App at 545. Thus, there is more than a "little likelihood" that the error affected the jury's verdict, and reversal and remand is required.

B.   *Transferred Intent and Count 4*

Although we reverse and remand on other grounds, we must now turn to address defendant's MJOA on Count 4. That is because if defendant is correct, the issue would be dispositive on Count 4, and our disposition would provide total relief, such that he could not be retried on that count. *See State v. Vinson*, 311 Or App 690, 489 P3d 1091 (2021) (discussing whether to reverse or reverse and remand). In his first assignment of error, defendant asserts that the trial court erred by denying his MJOA on Count 4, second-degree assault under ORS 163.175, as against MN, the bystander at the TriMet station. Defendant argues that the trial court improperly allowed the jury to consider a theory of transferred intent.

A judgment of acquittal is appropriate if the evidence is insufficient to support a verdict. *State v. Cunningham*, 320 Or 47, 61-62, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995); *State v. Newkirk*, 319 Or App 131, 133, 509 P3d 757, *rev den*, 370 Or 214 (2022). We review questions of the sufficiency of the evidence in a criminal case following a conviction by examining the evidence in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential elements of the crime beyond a reasonable doubt. *Cunningham*, 320 Or at 63. Our decision is not whether we believe that a defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for the factfinder to so find. *Id*.

MN was at a TriMet station about a block away from the shooting. She was struck on the neck by a piece

of hot metal shrapnel, which pierced the skin and required hospital treatment. The shrapnel itself was not recovered, as MN flung it off her neck while she ran away. It was not clear whether the shrapnel was a piece of a bullet or not. MN noticed she had been injured when the third shot went off.

As relevant here, "[a] person commits the crime of assault in the second degree if the person: * * * (b) Intentionally or knowingly causes physical injury to another by means of a deadly or dangerous weapon." ORS 163.175(1). Defendant argues that he did not intentionally or knowingly harm MN because his intent was to harm someone inside the vehicle, and that transferred intent is insufficient to convict him. The state argues that transferred intent is sufficient.

Transferred intent is a legal theory that states that if a person intends to harm one person, but misses and harms another, the intent transfers to the second person. We recently addressed that issue in *State v. Swinney*, 343 Or App 22, 35, 578 P3d 207 (2025), *rev allowed*, 374 Or 698 (2026). We concluded that ORS 163.175 allows for a conviction where a person intends to harm one person but instead harms another. *Swinney*, 343 Or App at 35. Importantly though, we noted that transferred intent is a legal fiction that—absent legislative intent to the contrary as demonstrated through statutory construction—we do not recognize. *Id*. "Rather, the elements of second-degree assault as codified in the text of ORS 163.175 encompass intentional assaultive conduct toward one person that actually (seriously) injures another."[4] *Id*.

Here, defendant engaged in assaultive conduct towards the occupants of the Durango by shooting at them. While defendant argued that MN might have been injured by shrapnel from a bullet fired from inside the Durango, the jury could have found that no bullets had been fired from inside the Durango given the physical evidence and the testimony of the two Marine veterans who witnessed the shooting. Thus, the jury could have concluded that the shrapnel was the result of defendant's assaultive use of a firearm and that

_____

[4] If second-degree assault is committed without a deadly or dangerous weapon, the standard increases from any physical injury to a *serious* physical injury. ORS 163.175(1)(a).

the shrapnel wounded MN. There was sufficient evidence for the jury to find defendant guilty on Count 4. Therefore, the court did not err in denying defendant's MJOA.

### C. *Cross-Examination of Defendant*

In his third assignment of error, defendant asserts that the prosecutor's race-based cross-examination of him denied him a fair trial. The issue is concededly unpreserved, and defendant requests plain-error review. We do not reach that assignment of error given that we reverse on other grounds. *See Shank v. Board of Nursing*, 220 Or App 228, 238 n 8, 185 P3d 532 (2008) (not addressing an issue that may not arise on remand). Further, given that racial comments are generally improper prosecutorial misconduct, the issue is unlikely to occur on remand given that the issue has been identified on appeal and ought be avoided or preserved should it occur on remand. *See State v. Farokhrany*, 259 Or App 132, 137, 312 P3d 584 (2013) ("[R]egardless of the prosecutor's motivation in making such comments, this court simply cannot tolerate conduct, blatant or subtle, that even borders on an attempt to introduce, at any stage of a trial, issues of racial, ethnic or religious bias.")

### D. *The Prosecutors' Closing Statements*

In his fourth assignment of error, defendant asserts that the prosecutors' improper closing arguments denied him a fair trial. Defendant concedes that those issues are unpreserved and requests plain-error review under the *Chitwood* framework. *See State v. Chitwood*, 370 Or 305, 321, 518 P3d 903 (2022). Defendant identifies nearly 30 statements in the prosecutors' closing arguments as problematic, which boil down to three issues: (1) vouching for the ability of the prosecutors' office and detectives, including stating facts not in evidence and falsehoods regarding the timing of defendant's self-defense claim; (2) the use of the theme "snake oil"[5] as a personal attack against defendant, defense counsel, and their witnesses; and (3) an argument that the jury should convict defendant to protect the community and children.

---

[5] *See* Jordan Friedman, *How Snake Oil Became a Symbol of Fraud and Deception*, Smithsonian Magazine (October 21, 2024), https://www.smithsonianmag.com/innovation/how-snake-oil-became-a-symbol-of-fraud-and-deception-180985300/ (accessed May 15, 2026).

Again, we do not reach that assignment of error given that we reverse on other grounds and that, because the issues have been identified on appeal, they ought to be avoided or preserved should they occur on remand. *See State v. Perez*, 373 Or 591, 615, 568 P3d 940 (2025) (reliance on facts not in evidence is improper); *Chitwood*, 370 Or at 320 ("Prosecutors may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking."); *State v. Sperou*, 365 Or 121, 129, 442 P3d 581 (2019) (a prosecutor may not express their personal opinion about the credibility of a witness; doing so is referred to as vouching); *State v. Almekinders*, 339 Or App 576, 582, 568 P3d 611, *rev den*, 374 Or 372 (2025) (factually incorrect statements are improper in closing argument); *State v. Halford*, 101 Or App 660, 663 n 3, 792 P2d 467 (1990) ("[P]ersonal attacks on opposing counsel have no place in Oregon courts."); *State v. Lundbom*, 96 Or App 458, 461, 773 P2d 11, *rev den*, 308 Or 382 (1989) (abuse of discretion to deny a mistrial after prosecutor called defense counsel and experts "pimps").

E.  *Sentencing*

In his fifth assignment of error, defendant asserts that the trial court erred when it imposed 36 months of post-prison supervision on Count 7, which made the cumulative punishment on that count greater than allowed by law. We do not reach defendant's fifth assignment of error because it concerns sentencing issues, which may not arise on remand.

### III.  CONCLUSION

The trial court erred by failing to give a jury instruction regarding the lack of a duty to retreat. As to the additional issues that we addressed, we conclude that the trial court did not err by denying defendant's MJOA as to Count 4. We do not reach the issues of the race-based cross-examination, the closing argument, or sentencing, as they may not arise on remand.[6]

Reversed and remanded.

---

[6] We remand on all counts, including the FIP count—even though defendant acknowledged his guilt—because it was charged with a firearm enhancement, which he may not necessarily be convicted of on remand. *See State v. Mickels*, 330 Or App 633, 637, 544 P3d 446, 448 (2024) (FIP "with a firearm", i.e. the use or threatened use of the firearm, is subject to self-defense).